(No. 13597.—Reversed and remanded.)

MINNIE NOONE, Appellee, vs. ALBERT OLEHY et al.
Appellants.

*Opinion filed February 15, 1921—Rehearing denied April 8, 1921.*

1. WILLS—*prejudice against relatives will not invalidate will unless there is an insane delusion.* Unreasonable prejudice against relatives is not ground for invalidating a will unless the testator's prejudice is shown to be the result of an insane delusion and his conduct cannot be explained on any other ground.

2. SAME—*when instruction as to unsoundness of mind on certain subjects is improper.* An instruction authorizing the jury to find that the will in contest is not the will of the testatrix, even though they believe she had sufficient capacity to attend to the ordinary business affairs of life, if she was of unsound mind with regard to subjects connected with the testamentary disposition and distribution of her property and the natural objects of her bounty and made the will while laboring under such unsoundness of mind, necessarily means that the testatrix was under an insane delusion, and should not be given where the issue of insane delusion was properly taken from the jury by the court for want of proof.

3. SAME—*when an instruction as to preponderance of evidence and credibility of witnesses is erroneous.* In a will contest case, where the number of witnesses testifying is important, an instruction which attempts to deal both with the credibility of the witnesses and the preponderance of the evidence is erroneous, where its whole effect is to minimize the influence of the number of witnesses testifying and to encourage the jury to disregard such element in comparison with other elements they are directed to consider as affecting the credibility of each witness and the weight to be given his testimony.

4. SAME—*when instruction as to burden of proof in will contest case is misleading.* In a will contest case an instruction stating merely that the burden of proof in the first instance is upon the proponents of the will to show that at the time of its execution the testatrix was of sound mind and memory is correct as an abstract proposition but is misleading unless considered in connection with the effect of the presumption of sanity.

5. SAME—*when statements of testatrix may be admitted.* Declarations by a testatrix several years prior to the making of her will, showing a feeling of kindness toward her sister, whom she practically ignores in the will, may be admitted, with other evidence, on the question of the mental capacity of the testatrix, but it cannot be considered as tending to invalidate the will.

6. PRACTICE—*exclusion of witnesses from court room rests in discretion of court.* The separation of witnesses and their exclusion from the court room are matters resting in the discretion of the court, and the order is usually made without requiring any special showing.

FARMER, J., dissenting.

APPEAL from the Circuit Court of Champaign county; the Hon. FRANKLIN H. BOGGS, Judge, presiding.

HERRICK & HERRICK, F. T. CARSON, and BUELL H. SNYDER, for appellants.

DOBBINS & DOBBINS, M. M. BACHELDER, and LOUIS J. BREMER, for appellee.

Mr. JUSTICE DUNN delivered the opinion of the court:

The circuit court of Champaign county entered a decree setting aside the probate of the will of Mary E. Villars on the finding of a jury that she was not of sound mind at the time of its execution and that it was not her will. The proponents of the will have appealed for a reversal of the decree.

Mary E. Villars, the testatrix, executed the instrument in controversy on October 14, 1918. She was a widow, fifty-six years old, without children, her husband having died a number of years before, and her two daughters, their only children, having died before him. Five months after executing the will she died, on March 12, 1919, leaving a sister and two brothers her only heirs. Her sister had been married, was divorced, and had one son about fourteen years old. Her brothers, Albert and William D. Olehy, were both married. William had no children and Albert had two sons, who were minors. The estate of the testatrix amounted to more than $100,000, and the will gave it substantially all to Albert and William and Albert's sons, there being besides the gifts for their benefit only a be-

297–11

quest of one dollar to the sister, $50 to her son and $500 for the care of a cemetery lot. The two brothers and Matilda Hill, who was a neighbor of the testatrix but not a relative, were named as executors without bond. The sister, Minnie Noone, filed a bill to contest the will, charging that it was obtained by undue influence and was the result of insane delusions in regard to the complainant, and that the testatrix was not of sound mind. At the close of the evidence the court withdrew the issues of undue influence and insane delusions and the question was submitted only on the issue of the soundness of mind of the testatrix.

The testatrix and her husband lived for many years in St. Joseph, in Champaign county. After his death, which occurred about 1906, she removed to Urbana, where she lived the rest of her life. She had two farms, containing over two hundred acres of land, which were occupied by tenants. She kept accounts at banks both in St. Joseph and Urbana and transacted all her own business, and with one exception there is no suggestion by any witness who ever had any business dealing with her, of any mental incapacity prior to the execution of the instrument in controversy. Mrs. Villars' father, F. M. Olehy, died intestate in the fall of 1917, leaving an estate consisting, in part, of three farms,—one in Champaign county, one in Vermilion county, Illinois, and one in Vermilion county, Indiana. Mrs. Villars, Mrs. Noone and their two brothers inherited the estate equally, but they were unable to agree upon a division. In the negotiations the brothers proposed a division and valuations of the farms which were unsatisfactory to Mrs. Noone. Mrs. Villars, while taking no active part in the negotiations, agreed with her brothers, saying, substantially, that she was willing to do what they said. The result was that Mrs. Noone began three partition suits, under which the lands were sold at higher prices than the values fixed by the brothers. Mrs. Noone also presented a claim against the estate which was at first objected to

by the other heirs but was afterward allowed. There was evidence that Mrs. Villars had been on friendly terms with her sister prior to their father's death, and that she had said that she felt sorry for Minnie; that Minnie had been sick a good deal and had a hard time, and that Mrs. Villars would take care of her and see that she should never want for anything. After her father's death and after the disagreement about the settlement of his estate she said that her sister had treated her very badly, had talked mean to her, and that she did not want to give her anything in her will. She told her attorney that she did not want to give her sister anything, but that she understood she had to mention her, so she decided to give her one dollar.

During the latter part of the life of Mrs. Villars she was afflicted with arteriosclerosis,—a disease of the arteries which affects the circulation of the blood and the heart,—and nephritis,—a disease of the kidneys which impairs their excretory functions,—and the effect of the two diseases, by reducing and vitiating the supply of blood to the brain, is to impair the mental powers. The evidence is that while the existence of these diseases does not necessarily, in their incipiency, establish unsoundness of mind, their tendency is to weaken or destroy the mental faculties, and the condition of arteriosclerosis is regarded as progressive and incurable.

The two lawyers who were engaged in the preparation of the will testified fully to the circumstances attending its preparation and execution and to the soundness of mind of the testatrix. They were attesting witnesses, and there was a third attesting witness,—a business man of long acquaintance with the testatrix,—who also testified to the circumstances of the execution and the soundness of mind of the testatrix. More than thirty witnesses, including lawyers, bankers, business men, tenants, neighbors and acquaintances of the deceased, after stating their acquaintance with and opportunity to observe and knowledge of her, testified that in their judgment she was of sound mind. Their testi-

mony covers a period of a number of years immediately
preceding her death. Seven or eight witnesses, after testi-
fying to their association with Mrs. Villars, expressed the
opinion that at various times between August, 1918, and
her death, in March, 1919, she was not of sound mind.
One witness who met and talked with her several times in
1918, the first conversation being in January, expressed the
opinion that on each of these occasions she was of unsound
mind. One of the witnesses was Dr. Hanmore, a physi-
cian who attended her in 1916, when she had sustained a
Potts fracture. He testified that she was then suffering
from arteriosclerosis and he believed she was of unsound
mind. There were no other witnesses who had ever seen
Mrs. Villars who expressed the opinion that she was of
unsound mind, but two physicians, experts of wide experi-
ence in the treatment and care of mental diseases, testified
that in their opinion, assuming the facts stated in a hypo-
thetical question put to them by the contestant's counsel,
the person referred to in the question was of unsound mind
on October 14, 1918. Aside from the testimony of the
two experts the preponderance of the evidence was clearly
in favor of the proponents of the will, and it is apparent
that the evidence is not such as would justify affirming a
decree for the contestant if error was committed on the
trial, on the ground that the verdict was clearly right in
spite of the error.

The sixth instruction given to the jury at the request
of the appellee was as follows:

"If you believe from the evidence that although Mary
Villars had sufficient capacity to attend to the ordinary busi-
ness affairs of life, yet that with regard to subjects con-
nected with the testamentary disposition and distribution of
her property and the natural objects of her bounty she was
of unsound mind, and while laboring under such unsound-
ness of mind she signed the alleged will in question, and
that in making and signing it she was so far influenced or

controlled by such unsoundness as to be unable rationally to apprehend the nature and effect of the provisions of said alleged will, and was thereby led to make the alleged will as she did, then you must find the alleged will not to be the will of the said Mary Villars."

This instruction was based upon the hypothesis that the testatrix was of unsound mind in regard to subjects connected with the testamentary disposition and distribution of her property and the natural objects of her bounty. The same hypothesis is contained in five others of the eighteen instructions given at the request of the appellee. The sixth instruction is substantially in the language of instruction No. 15 given in the case of *Dowie* v. *Sutton,* 227 Ill. 183. The instruction in that case was based upon the appellee's theory that the testator was the victim of certain delusions that influenced him in making the will, and there was evidence that he was possessed of the insane delusion that he was the object of constant and unrelenting persecution of all women, who were engaged in a conspiracy to destroy his life by poison because he remained unmarried, and under the influence of these delusions his conduct was absurd and irrational. The condition of the evidence in this case is entirely different. The court instructed the jury that the evidence offered by the contestant was insufficient to support a verdict for the contestant on the issue of insane delusions of the testatrix, and that issue was therefore withdrawn from the case. This instruction was rightly given, and no cross-error has been assigned on the action of the court in giving it. There was no evidence presented of any insane delusion of the testatrix. The instruction assumes that she had sufficient capacity to attend to the ordinary business affairs of life, and yet that with regard to subjects connected with the testamentary disposition and distribution of her property and the natural objects of her bounty she was of unsound mind. A person who has sufficient capacity to attend to the ordinary business affairs of

life is ordinarily possessed of such soundness of mind as the law requires for the execution of a will. A testator may, however, while possessed of sufficient mental capacity to execute a will be of unsound mind upon a particular subject and may under the influence of that unsoundness of mind be incapable of acting rationally. The instruction under consideration refers to such a case,—that is, to a case where there was unsoundness of mind connected with the testamentary disposition and distribution of the testatrix's property and the natural objects of her bounty. This can refer only to an insane delusion in that respect. If the testatrix was of unsound mind in regard to the testamentary disposition of her property and the natural objects of her bounty, such unsoundness could only have been an insane delusion. It is not, and cannot be, claimed that she was ignorant of the existence of her brothers and sister and nephews or did not recognize their relation to her. The only supposed evidence of unsoundness of mind with regard to subjects connected with the testamentary disposition and distribution of her property and the natural objects of her bounty is her failure to recognize the claims of her sister and her sister's son as entitled to the same consideration as those of her brothers and her one brother's sons.

It is argued by counsel for the appellee that Mrs. Villars' statement that her sister had treated her badly about the settlement of their father's estate and her desire to exclude her sister from any benefit under her will was the result of her diseased condition and unsoundness of mind,—that is, was the product of an insane delusion. "Prejudice of the testator against a relative is not ground for setting aside a will unless it can be explained upon no other ground than that of an insane delusion. A person may be prejudiced against some of his children or persons who are the natural objects of his bounty and make unfair remarks about them without having a proper foundation for his conduct, but it does not necessarily follow that he is with-

out testamentary capacity. Unreasonable prejudice against relatives is not ordinarily ground for invalidating a will. That can only be done when the testator's aversion is shown to be the result of an insane delusion, his conduct not being able to be explained on any other ground." (*Carnahan* v. *Hamilton*, 265 Ill. 508.) In this case, and also in *Owen* v. *Crumbaugh*, 228 Ill. 380, it is said that an insane delusion which will render one incapable of making a will is difficult to define, and in those cases are set forth various definitions of the term as given in the decisions of this court. In the latter case it was said, on page 401 : "Whatever form of words is chosen to express the legal meaning of an insane delusion, it is clear, under all of the authorities, that it must be such an aberration as indicates an unsound or deranged condition of the mental faculties as distinguished from a mere belief in the existence or nonexistence of certain supposed facts or phenomena based upon some sort of evidence. A belief which results from a process of reasoning from evidence, however imperfect the process may be or illogical the conclusion, is not an insane delusion. An insane delusion is not established when the court is able to understand how a person situated as the testator was, might have believed all that the evidence shows that he did believe and still have been in full possession of his senses. Thus, where the testator has actual grounds for the suspicion of the existence of something in which he believes, though in fact not well founded and disbelieved by others, the misapprehension of the fact is not a matter of delusion which will invalidate his will." In this case a disagreement had arisen among the heirs of the testatrix's father as to the distribution of his estate. Mrs. Noone presented a claim which the other heirs did not approve of. She disagreed with her brothers in regard to the value of the land and its division. In that controversy Mrs. Villars took the side of the brothers, and while she had little to do with the controversy she always expressed

herself as wanting to do what they wanted, and she adhered to that view. Mrs. Noone began litigation which involved the heirs in considerable expense. It is argued that Mrs. Noone's attitude was always correct and fair; that the unfairness in the relations of the parties was on the part of the brothers and of Mrs. Villars and not of Mrs. Noone; that the result of the litigation and the sale of the land indicated that Mrs. Noone was right as to the value of the property, which sold for more than the valuations which the brothers were willing to put upon it, and it is argued that her claim against the estate for the care of her father was just. But it was not a question whether Mrs. Noone treated Mrs. Villars and her brothers badly or whether they treated Mrs. Noone badly. The question was whether it was an insane delusion on the part of Mrs. Villars to think that her sister had treated her badly. There was no other ground for the assumption that Mrs. Villars was of unsound mind on subjects connected with the testamentary disposition and distribution of her property and the natural objects of her bounty. It may be that the brothers were harsh, grasping and avaricious in their dealings with Mrs. Noone and that Mrs. Villars was mistaken in thinking that the fault was on the side of Mrs. Noone, but it cannot be said that only an insane mind could entertain such a view. In controversies in families in regard to property a wide diversity of view is not uncommon, and it is not uncommon for each side to believe the other has acted unfairly, though an unprejudiced, disinterested person may find no occasion for such belief upon either side or may find that one side rather than the other is in the right. The fact that either party thinks that the other has been unfair is not evidence of unsoundness of mind. There was no evidence upon which to base this instruction and the other instructions containing the same hypothesis and it was erroneous to give them.

The first instruction given at the instance of the appellee was as follows:

"The court instructs the jury that the credibility of the witnesses and the weight to be given to their testimony and to the opinions which they may have expressed, is a question exclusively for your determination and that the law is, where a number of witnesses testify upon a given side of a proposition and a lesser number testify directly opposite thereto, you are not bound to regard the weight of the evidence as preponderating in favor of.that side upon which the greater number of the witnesses testify. You have a right to determine from the appearance of the witnesses, on the stand their apparent candor and fairness or lack of the same; their apparent interest or lack of interest, if any is shown by the evidence, in the result of the suit; their apparent intelligence or want of the same; the means and opportunity of knowing the things about which they testify; the reasonableness and probability of the things testified to by the witnesses, and give to the testimony of each witness such weight and credit as in your judgment it ought to receive."

This instruction concerns both the credibility of witnesses and the preponderance of the evidence. Its object is to inform the jury that they must judge the credibility of the witnesses and weigh their evidence, to inform them of the tests by which their credibility is to be determined and to advise them as to the weight to be given to the greater number of witnesses. So far as the instruction states the elements which the jury may take into consideration in determining the credibility of witnesses it is not objected to by the appellants, but the objection is made that the instruction omits altogether the number of witnesses as a factor in determining upon which side is the preponderance of the evidence. If the instruction had omitted any reference to the preponderance of the evidence it would not

have been subject to the criticism made upon it. Substantially the same instruction was considered in the case of *Elgin, Joliet and Eastern Railway Co.* v. *Lawlor*, 229 Ill. 621, and after an analysis of various cases in which it was claimed the instruction had been approved, it was said that the instruction had not received the unqualified approval of the court or that it could be said that it might not be misleading in a case when the question of number was important and no other instruction was given supplementing it, but the court did not feel justified in reversing the judgment in that case on account of that instruction. In the present case the question of number was important and no instruction supplementing the one complained of was given. The only rule stated in the instruction in regard to the number of the witnesses was, that the jury were not bound to regard the weight of the evidence as preponderating in favor of that side upon which the greater number of witnesses testify. The instruction thus introduces the question of the preponderance of the evidence and then proceeds to enumerate a number of elements to be considered as affecting the credibility of each witness and the weight of his testimony. Nowhere does it say that the number of witnesses also is to be considered in determining the weight of the evidence, but the whole effect of the instruction is to minimize the influence of the number of witnesses and encourage the jury to disregard this element in comparison with others which they are directed to take into consideration. In cases where a testator has disposed of his property unequally among those standing in the same relation to him, jurors are naturally inclined to seek a reason for setting aside the will. In this case the greater number of witnesses testified in favor of the proponents of the will and the preponderance of all the evidence is apparently with them. In enumerating the elements which the jury should consider in weighing this evidence the court failed to mention the number of witnesses, and the verdict of

the jury, thus led to believe the number of witnesses of little importance, may have been induced by this instruction. It should not have been given.

Objection is made to the second instruction, which told the jury "that the burden of proof in this case, in the first instance, is upon the proponents of said alleged will, to show that at the time of the execution of the alleged will, the said Mary E. Villars was of sound mind and memory." While the abstract proposition declared by this instruction is correct, it is misleading when considered without qualification because it does not take into consideration the effect of the presumption of sanity; but this defect was remedied by instructions 13 and 14 given for the appellee, which informed the jury in regard to the presumption of sanity and the weight to be given it in favor of the appellee in considering the evidence and in arriving at their verdict.

The eleventh instruction was as follows:

"The court instructs the jury that while a person of sound mind has a right to dispose of their property as they see fit, and may disinherit a brother or sister and give nothing to their relatives yet that this is not true of a person whose mind is unsound upon the question of the claims upon her of those who are the natural objects of her bounty at the time she undertakes to make a will, and if you believe from the evidence in this case that the testatrix Mary Villars was of unsound mind at the time she made the instrument in question alleged to be her will, upon the question of who were the natural objects of her bounty, or upon the question of the effect of the disposition she was making of her property then she would have no right to make a will, whether such will undertaken to be made was fair or unfair, just or unjust."

It is subject to the same criticism as the sixth instruction. The substance of this instruction is, that if the jury believe from the evidence that the testatrix was of unsound mind upon the question of who were the natural objects

of her bounty and upon the question of the effect of the disposition she was making of her property then she would have no right to make a will, and it is also subject to the criticism made in *Nieman* v. *Schnitker,* 181 Ill. 400, of a similar instruction, viz., "that a person may have upon some subjects, and even generally, mind and memory and sense to know and comprehend ordinary transactions, and yet upon the subject of those who would naturally be the objects of his care and bounty, and of a reasonable and proper disposition as to them of his estate, he may be of unsound mind." In holding it was error to give this instruction the court quoted from the earlier case of *Freeman* v. *Easly,* 117 Ill. 317, as follows: "In this case the testator suffered greatly from severe bodily disease, and no doubt his mind was affected to a degree it might be, at least in a partial sense, unsound; but the jury should not, for that reason alone, be told, as a matter of law, that would incapacitate him to make a valid will. That would be to state the rule of law on this subject broader than the authorities in this and other States will warrant. * * * It accords with common observation that in contests concerning wills, where the testator has made, or has seemingly made, an unequal or inequitable disposition of his property among those occupying the same relation to him, by consanguinity or otherwise, there is a disposition in most minds to seek for a cause for holding the will invalid. The inclination in this direction that is found to exist in the minds of most, if not all, jurors, cannot always be controlled by instructing them there is no law requiring a testator, nor is he bound, to devise his property equitably cr in equal proportions among his heirs. Of course, the law is he may make such disposition of his property as he sees fit, and he may bestow his bounty where he wishes, either upon his heirs or others. While this is undoubtedly the law the common mind is disinclined to recognize it, and jurors will too frequently seize upon any

pretext for finding a verdict in accordance with what they regard as natural justice." The only effect of the instruction under consideration was to furnish such a pretext.

The court admitted, over defendants' objections, the testimony of witnesses as to statements made by the testatrix at various times, and several years before the execution of the will, in regard to Mrs. Noone's health and physical condition and a certain operation which had been performed upon her and testatrix's intention to see that she was taken care of. The statements tended to show a feeling of kindness and affection for her sister on the part of the testatrix when they were made, and were competent, in connection with the other evidence in the case, on the question of the testatrix's mental capacity, though such statements cannot be considered as tending to invalidate the will merely because they may indicate an intention at variance with its provisions. *Reynolds* v. *Adams,* 90 Ill. 134; *Waters* v. *Waters,* 222 id. 26; *Cheney* v. *Goldy,* 225 id. 394.

The court made an order at the opening of the trial for the separation of the witnesses and their exclusion from the court room. This ruling is assigned for error; but such an order is in the discretion of the court and is usually made without requiring any special showing. There was no error in making the order in this case.

Other errors assigned relate to remarks of counsel during the progress of the trial, misconduct of one of the jurors during the trial, taxation of costs and questions of minor importance, which are not necessary to the decision of the cause and will not therefore be considered.

The decree will be reversed and the cause remanded for a new trial.                    *Reversed and remanded.*

Mr. JUSTICE FARMER, dissenting:

I disagree with what is said in the opinion of the court as to the first instruction given for appellee. The instruc-

tion informed the jury of matters proper to be considered in determining the weight and credit to be given to the testimony of the witnesses and told them they were not bound to regard the evidence as preponderating in favor of the side on which the greater number of witnesses testified. The opinion holds that because of the latter clause the instruction was erroneous and should not have been given. This holding is based on the proposition that the number of witnesses testifying on opposite sides is an element to be considered by the jury in determining on which side is the preponderance and that the jury might be led to believe that the number of witnesses was of little or no importance. When the entire instruction is considered it seems very clear to me that there is no valid basis for holding it erroneous. It cannot be questioned that the statement that the jury were not bound to regard the preponderance as in favor of the side on which the greater number of witnesses testified is a correct proposition. The phrase in the instruction condemned states a correct proposition and does not seem to me to convey the slightest intimation that the jury might disregard the matter of number and arbitrarily find the preponderance on the side of the smaller number. To give it that construction seems to me unwarranted. True, a similar phrase in an instruction in *Elgin, Joliet and Eastern Railway Co.* v. *Lawlor,* 229 Ill. 621, was criticised, but in *North Chicago Street Railroad Co.* v. *Wellner,* 206 Ill. 272, and *McKinnie* v. *Lane,* 230 id. 544, instructions containing substantially the same language were approved. In my judgment no reasonable inference is warranted by the instruction, considered as a whole, that the number of witnesses testifying was not an element to be considered in determining the preponderance.