(No. 14219.—Decree affirmed.)
BESSIE IRENE CATT *et al.* Appellees, *vs.* ELLA ROBINS
*et al.*—(SAMUEL J. ROBINS, Appellant.)

*Opinion filed October 21, 1922—Rehearing denied Dec. 7, 1922.*

1. WILLS—*use of intoxicating liquor as affecting mental capacity is a question of fact.* Whether a testator used intoxicating liquor to the extent of so undermining his mental faculties as to make him incompetent to make a will is a question of fact for the jury in a will contest case, if that issue is raised.

2. SAME—*to set aside will the incompetency of testator must be operative when will is made.* The incompetency recognized as a basis for setting aside a will must be operative at the time the will is made, and whether or not it was so operative is a question of fact for the jury.

3. SAME—*trial court must judge foundation evidence for non-expert opinion.* Before a non-expert witness is entitled to express an opinion as to the mental capacity of the testator in a will contest case he must state sufficient facts upon which to base his opinion, but the question whether the facts stated form a sufficient basis for an opinion is one for the trial court to determine.

4. SAME—*what instruction as to effect of habitual use of intoxicating liquor is not proper.* In a will contest case, where there is evidence that the testator was addicted to the habitual and excessive use of intoxicating liquor, an instruction which states that the excessive and habitual use of intoxicating liquor impairs both the body and mind should not be given, as the proposition embodied therein is a statement of fact and not a proposition of law.

5. SAME—*jury may consider provisions of will, with other evidence, on question of mental capacity.* While the jury have nothing to do with the reasonableness or unreasonableness of the provisions of a will, and such provisions, standing alone, are not proof of unsoundness of mind, the jury may consider them in deciding the question of mental capacity of the testator, if there is other evidence bearing on that issue.

6. SAME—*what instruction is proper if there is evidence of insane delusions.* If there is evidence in a will contest case that the testator had insane delusions, an instruction is proper which states that although the testator may have had sufficient capacity to attend to the ordinary business affairs of life, yet his will would

be invalid if it was the result of unsoundness of mind with regard to the subjects connected with the testamentary disposition of his property and the natural objects of his bounty. (*Noone* v. *Olehy*, 297 Ill. 160, distinguished.)

APPEAL from the Circuit Court of Lawrence county; the Hon. JULIUS C. KERN, Judge, presiding.

KRAMER, KRAMER & CAMPBELL, P. W. BARNES, and N. M. TOHILL, for appellant.

GEE & GEE, SHAW & HUFFMAN, and W. A. CULLOP, for appellees.

Mr. JUSTICE STONE delivered the opinion of the court:

William E. Robins died, leaving a will, at the age of seventy-two years, after an illness caused by cerebral hemorrhage. He had been married three times. Appellee Ella Seaver is a daughter by his first marriage. His first wife divorced him, and to his second marriage was born a son, Samuel, the appellant, and two daughters, now deceased, leaving surviving them appellees Louis Croslow and Bessie Irene Catt. Prior to the last seven years of his life Robins lived on a farm in Lawrence county which he inherited from his father, as he did the other lands which he owned at the time of his death. It appears that oil was discovered on these farms and he became a wealthy man. After the discovery of oil he left his home on the farm and moved into Lawrenceville and built a home there. In 1913 he married Ella Robins, now his widow, and lived with her until his death, in the city of Lawrenceville. Appellees contested the will on the ground of want of testamentary capacity on account of excessive use of alcoholic liquors. This was the only issue before the jury. The evidence for the contestants was that during all his years of maturity he was very much addicted to the use of intoxicating liquors; that after the

discovery of oil and the consequent increase in his wealth his use of liquors greatly increased. The testimony of a number of witnesses who lived in and near the family was that for the last seven years of his life he was practically always in an intoxicated condition.

On the trial 158 witnesses testified,—83 for the proponents and 75 for the contestants. It cannot be hoped that an analysis of all this testimony can be set out within the limits of this opinion. Of the 83 testifying for the proponents, 75 were residents of Lawrence county and 8 non-residents of the State. Of the contestants' witnesses, 55 were residents of Lawrence county and 20 non-residents of the State. Of the proponents' witnesses, 79 testified concerning testator's sanity. Of these, 10 had known him since boyhood, 9 had known him for over forty years, 13 were his neighbors in Lawrenceville, 7 saw and talked with him on the day on which the will was executed and others a few days before. Contestants' witnesses were farmers, men connected with the oil business, carpenters, barbers, automobile men, painters, salesmen, coal miners, ex-saloon keepers, housewives, house-maids who had lived in the family, and neighbors in Lawrenceville and Lawrence county. The testimony of these witnesses tends to show that throughout his lifetime the testator was more or less given to eccentricities and peculiarities. Some of contestants' witnesses testified that he was known in the community as Crazy Ed; that he frequently abused his parents; that after he acquired wealth he gave himself over to excessive drink. The testimony shows that his farms were allowed to deteriorate and the buildings thereon to fall into decay and that he was negligent in his personal appearance; that he at times showed evidence of a delusion that those whom he met were attempting to take his money away from him; that he would tie his horses in the barn for months at a time without giving them exercise and until their hoofs grew out four times the normal size; that he refused to allow them

to be turned out, for the reason, as he said, that it might kill them. The evidence also shows that he was slovenly in his habits, and that he permitted domestic animals and chickens to run in his house; that after he moved into Lawrenceville he kept quantities of whisky in the house and consumed on an average a quart a day and said he could not get along without it. One of the witnesses who had been a saloon-keeper testified that he sold the testator from forty to fifty gallons of whisky per year. Another witness, who also had been a saloon-keeper, testified to selling him large quantities of whisky and other intoxicating liquors. Witnesses who were barbers testified to his being in a drunken stupor when brought to the barber shops; that his wife brought him there, as she said, to have him cleaned up; that at times he had delusions that his meals had been poisoned. Witnesses who worked in and about the house of the testator testified that they never saw him any other way than intoxicated; that he was nervous and forgetful; that he would drink whisky before he got up; that he took at least fifteen drinks a day; that they saw empty bottles hauled away by the barrel; that he at times was unable to wash and dress himself. One witness doing work as a maid in the home testified that the testator was constantly in a state of intoxication; that he slept with his clothes on at times; that he required a midnight lunch; that she had seen him up and about the house at midnight, walking about, muttering and motioning with his hands; that at times he would not know her, and that when his wife said to him, "This is Maude," he would reply, "Maude who?" that he repeatedly asked the same questions of her. Several other witnesses testified to his constant intoxication during the last years of his life.

The testimony of the proponents' witnesses tended to establish that testator had attended during his lifetime to the running of the farms; that he turned in his list of property for tax assessment and other matters pertaining to the care

of the funds which came to him by reason of the discovery
of oil. Numerous witnesses testified that they had seen
him more or less frequently and that they had never seen
him under the influence of intoxicating liquors. While some
testified to his use of liquors, their testimony was that when
they saw him he was not intoxicated. Some of the wit-
nesses had known him for a number of years. The testi-
mony of the proponents' witnesses also shows that at the
time of the making of the will the testator read it over him-
self, and they expressed the opinion that he was at that time
sane and of a disposing mind and memory.

Appellant contends that the best proof of testator's men-
tal condition is the fact that he transacted his own business
and that no one ever took advantage of him. Appellees re-
ply that there were times when advantage was taken of him,
and that for the most part he did not exercise good business
judgment when he acted upon his own resources; that the
record shows his wealth was given to him or came by means
of the good fortune in the discovery of oil, to neither of
which circumstances he contributed anything whatever. In-
stances are cited in the testimony of witnesses for appellees
of the exercise of poor business judgment, as they contend,
such as permitting his farms to deteriorate and in the treat-
ment of his farm animals; that he on one occasion pur-
chased a winter supply of coal though he knew that he ex-
pected to be in the south all winter and that his house would
be closed; that he was made the butt of business and other
jokes; that he bought a ram because it had a black face,
and when it rained the black was washed off the ram's face.

The will bequeathed the sum of $100 to his daughter,
Helen. The proof shows that he never had a daughter
Helen but that Ella Seaver is his daughter, born near the
time when his first wife secured a divorce from him. It
appears that she moved to California. Some of the con-
testants' witnesses testified that she later came back to visit
him; that he said during the last years of his life that

he had a daughter in California named Ella Seaver. It is urged by appellees that this testimony shows that prior to the making of the will the testator had known that he had a daughter named Ella Seaver, and that the provision in the will giving $100 to Helen Robins was evidence that he did not know the natural objects of his bounty at the time the will was made. Appellant contends that this is not to be taken as evidence of such, for the reason that he had never seen this daughter, as she lived in California and had never written to him, and that it was not unusual that he should not remember her name. The probative force of such testimony was for the jury.

Much of the testimony of the witnesses, both for contestants and for proponents, touching the testamentary capacity of the testator is of little value by reason of insufficient opportunity for observation on the part of the witnesses giving the testimony. The question of testamentary capacity on the part of the testator was for the jury. Whether or not the testator used intoxicating liquors to the extent of so undermining his mental faculties as to make him incompetent to make a will was an issue of fact. The record contains evidence which, if believed by the jury to be true, might well cause them to feel that the testator was incompetent to make a will. The incompetency recognized as a basis for setting aside a will must be operative at the time the will is made. Whether or not it was so operative was a question of fact for the jury. This issue has been twice presented to a jury, who have returned the same verdict in both instances. We are unable to see wherein the submission of the cause to another jury might bring a different result. We are of the opinion, therefore, that we would not be justified in setting aside the verdict on the ground that it is contrary to the weight of the evidence.

Appellant complains of the admission of incompetent testimony,—principally the admission of opinions as to the

305—6

mental competency of the testator not based on sufficient facts to render the witnesses competent to give opinions. It has been held that before a non-expert witness is entitled to express an opinion as to the mental capacity of the testator he must state sufficient facts upon which to base it. (*Hettick* v. *Searcy,* 278 Ill. 116; *Walker* v. *Struthers,* 273 id. 387.) No rule can be laid down which can in any given case determine how much evidence is necessary to lay the foundation for the admission of non-expert opinion evidence in cases of this character. The trial court must determine whether such witnesses stated sufficient facts upon which to predicate their opinions, and unless the trial court abuses the discretion placed in it, the admission of such testimony will not work a reversal of the case, as testimony not based upon sufficient knowledge is naturally of but little probative force. We have examined the testimony objected to and see no reversible error in its admission.

Appellant also contends that proponents were unduly restricted in the cross-examination of witnesses. An examination of the abstract shows that for the most part this objection is based on the refusal of the court to permit counsel to go into the life history of the witness who was giving an opinion concerning the soundness of mind of the testator. There were other objections of a minor nature. The objections were numerous, but on an examination of the abstract we are convinced that appellant was not prejudiced by the rulings of the court thereon. Testimony was admitted showing instances occurring in the life of the testator and his habits for many years back. This was objected to on the ground it was too remote. The testimony was remote, but the proponents appear to have opened this field by the examination of their witnesses and cannot now complain that the matter was gone into by the contestants.

Appellant also contends that the court erred in giving and refusing instructions. Instruction No. 1 given at the

request of the contestants is objected to because it states as a legal proposition that it is common knowledge from the experience of men that the excessive and habitual use of intoxicating liquors for a long period of time impairs the mental capacity of the individual using such intoxicating liquors. The argument is that while this might be true in some instances, it cannot be said as a matter of law, in the absence of proof, that it is true. While this instruction may have stated a fact within common knowledge, yet it was not proper as a proposition of law and should not have been given. We are of the opinion, however, that the giving of this instruction does not justify a reversal of the decree.

Contestants' second instruction is criticised because it told the jury that they might consider any unreasonableness or inequality in the provisions of the will in determining the mental capacity of the testator. In *England* v. *Fawbush,* 204 Ill. 384, this court said, in approving a similar instruction: "We have held that while inequality in the distribution of property is not of itself conclusive evidence of undue influence, yet it may be considered as a circumstance tending to establish undue influence, in connection with all the other facts and circumstances in the case." In *Webster* v. *Yorty,* 194 Ill. 408, it was held that the validity of a will cannot rest upon the opinion of the jury as to its being reasonable or fair. A person of testamentary capacity has a lawful right to dispose of his property as he may choose, and the reasonableness or fairness of the will are not questions for the jury, but the unreasonableness or unfairness of a will may be considered as a circumstance in connection with all other facts and circumstances proved in the case on the question whether there was undue influence. In *Kaenders* v. *Montague,* 180 Ill. 300, it was held that the reasonableness, justice or propriety of a will are not questions for the jury to pass upon, although the unreasonableness of the testamentary disposition of property may be

considered as a mere circumstance tending to show unsoundness of mind or undue influence, with all the other facts and circumstances proven in the case. To the same effect are *Taylor* v. *Pegram,* 151 Ill. 106, and *Nicewander* v. *Nicewander,* 151 id. 156. In *Donnan* v. *Donnan,* 236 Ill. 341, this court said: "We have repeatedly held that inequality in the distribution of property may, in connection with other facts and circumstances proven, be considered upon the question of the soundness of mind of the testator or whether he was unduly influenced to make the will; but it has never been held, we believe, that the unequal distribution of property by a testator was primarily, or of itself alone, to be considered as evidence tending to prove unsoundness of mind or undue influence. Where other facts and circumstances are proven tending to show such condition of mind at the time the will was made, then inequality may be considered also, in connection with such facts and circumstances proven. No presumption is raised against the validity of a will because of inequality in the distribution of property, nor, standing alone, is it to be considered as a circumstance against the validity of the will." This court held in that case that the instruction there complained of was erroneous, in that it conveyed to the jury the impression that they should consider inequality and unreasonableness in a testamentary disposition of property primarily as evidence of unsound mind or undue influence, and that it unduly emphasized inequality and unreasonableness as elements to be considered in determining the validity of the will. Contestants' second instruction in this case told the jury that they were to determine whether or not the testator had sufficient mental capacity at the time of making the purported will to enable him to understand the particular business in which he was engaged, and in determining the question they had a right to take into consideration, "along with the other evidence in the case, in determining the mental capacity of the testator, any inequality or unreasonable-

ness of the provisions of the will with reference to the amount of the testator's property and the situation and condition, financially, of his relatives entitled to his bounty." This instruction is within the rule of the cases cited. Those decisions hold that inequality in the distribution of property does not make an invalid will, but testimony concerning the same may be considered on the question of mental capacity or undue influence. This instruction so informs the jury.

Appellant contends that contestants' fifth instruction is erroneous. That instruction told the jury that though they believed from the evidence that the testator, at the time of making the will, had sufficient capacity to attend to the ordinary business affairs of life, "yet that with regard to subjects connected with testamentary disposition and distribution of his property and the natural objects of his bounty he was of unsound mind and memory, and while laboring under such unsoundness of mind and memory he signed the alleged will in question, and that in making and signing it he was so far influenced or controlled by such unsoundness of mind and memory as to be unable rationally to apprehend the nature and effect of the provision of said alleged will and was thereby caused to make the said alleged will as he did, then you must find the alleged will not to be the will of said William E. Robins." Appellant cites the case of *Noone* v. *Olehy,* 297 Ill. 160, where a similar instruction was held to be erroneous for the reason that the question of insane delusions having been withdrawn from the jury there was nothing on which to base the instruction. In *Dowie* v. *Sutton,* 227 Ill. 183, a similar instruction was approved for the reason that there was evidence in the case tending to show that the testator had insane delusions, which influenced him in making the will. In the instant case there is evidence by contestants that Robins had an insane delusion that his family were poisoning his meals, and that everybody, including his family, was seeking to get his money from him. Evidence was also offered, which

has been referred to in the opinion, and which, it is urged by appellees, shows, that he believed that he had a daughter, Helen Robins, and that he bequeathed the sum of $100 to her; that he knew that his only daughter was named Ella Seaver, and that she had visited him. Without passing upon the probative force of this testimony, it is the theory of the contestants that Robins was affected by insane delusions, and under the authority of the cases cited here, the instruction on that theory of the case was properly given to the jury.

Contestants' eighth instruction is also objected to, for the reason, among others, that it told the jury that they might take into consideration the fact, if it was a fact, that the testator did not remember the name of his only living daughter. The argument is that such an instruction could only attract attention and tend to show that the testator should have remembered his daughter's name and have given her a more substantial bequest. The practice of singling out a portion of the evidence and calling the attention of the jury to the same has never been countenanced by this court. In view of the fact, however, that in this case there was no question as to his having had one daughter or as to her name, we are of the opinion that while this practice cannot be approved, the giving of the instruction is not ground for reversal. The instructions fairly and fully informed the jury as to the law involved.

Other objections are urged to instructions, but on examination of all instructions given and refused we are of the opinion that the court did not err in its rulings thereon.

There appears to be no reversible error in the record. The decree of the circuit court setting aside the will is therefore affirmed.